In the

# United States Court of Appeals

### For the Seventh Circuit

No. 06-2847

CURTIS L. DALE,

*Plaintiff-Appellant,*

*v.*

PAMELA POSTON et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 C 143—**Sarah Evans Barker,** *Judge.*

ARGUED SEPTEMBER 19, 2008—DECIDED NOVEMBER 21, 2008

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. Curtis Dale, a federal prisoner, filed this suit in 2002 against several prison employees claiming that they violated the Eighth Amendment by failing to protect him from an attack by another inmate. The case has gone back and forth with both Dale and the government going 2 for 4: a loss for Dale at the pleading stage, a win by Dale on appeal, a win by Dale before a jury on a threshold issue, and finally a loss for Dale on summary judgment. The last loss brings the case before us a second time.

Dale filed his complaint in the district court in 2002, naming Officer Pamela Poston, counselor Eric White, and Harley G. Lappin, then the warden at the prison, as defendants. Later, Dale amended his complaint to include two additional defendants, Officer Phyliss King and Officer Lynn Fortune. The district court screened the complaint under 28 U.S.C. § 1915A and dismissed the warden as a defendant. Still later, the district court granted summary judgment in favor of the defendants on the ground that Dale had failed to exhaust his administrative remedies.

Dale appealed, and we reversed and remanded the case for further proceedings finding that "the defendants did not meet their burden of establishing the absence of disputed issues of material fact concerning [the exhaustion] question." *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004).

On remand, a jury trial was held to determine whether the defendants had proven by a preponderance of the evidence that Dale had failed to exhaust his administrative remedies. The jury determined that the defendants had not met their burden. Accordingly, the case proceeded on to the merits of Dale's claims. In 2006, the district court granted the defendants' motion for summary judgment. Today, we resolve Dale's appeal from that judgment.

Usually, we begin our discussion in a case like this by repeating the oft-stated rule that we review the facts in the light most favorable to the nonmoving party. In this case, however, the facts as we will soon go on to state them come from the government because the district court

concluded that Dale's "Statement of Facts" violated the court's local rule. For reasons we will explain later, that little twist causes no concern as we proceed to recall the settled facts in some detail.

Dale was serving time at the high-level security penitentiary at Terre Haute, Indiana, after he pleaded guilty to drug charges in 1998. As part of a plea agreement, Dale agreed to cooperate with the government and provide testimony against persons involved in the drug trade. Terre Haute, home to the only death row in the federal system, is not known for its hospitality. For "snitches" it is even worse.

Things went okay for Dale at first. When he started leaving the prison on writs of habeas corpus *ad testificandum*, they got a little testy. After providing testimony against several individuals, Dale returned to Terre Haute on October 21, 1999. Pursuant to Bureau of Prison (BOP) policy, he was placed in the Special Housing Unit (SHU) pending a review of his return circumstances. BOP policy requires a temporary stay in the SHU, a unit that isolates prisoners from one another, whenever an inmate returns from a writ due to the potential dangers arising from cooperation. The SHU provides inmates "the highest form of personal protection" available at Terre Haute, and inmates can always request "lock up" (a.k.a. "protective custody") in the SHU if they fear for their safety. If an inmate requests protective custody he is housed in the SHU until an investigation can be completed. The record is not entirely clear on this point, but it appears that prison officials will not remove an

inmate from the SHU even if his fears are completely unfounded. The purpose of the investigation is to determine whether there is a legitimate threat, not whether the inmate should be permitted to remain in the SHU. No inmate is forced to enter the general population if he believes his safety is at risk.

After a routine evaluation in which Dale expressed no concerns for his safety, he was placed in the general population "E Unit." It was then that his troubles started. One of the individuals against whom Dale testified, Sean Lewis, also lived in the E Unit. Though Dale said nothing at the time, he would later testify that he was having problems with Lewis, as well as with certain members of the "Muslim community." But as far as prison authorities knew, Dale served his time from mid-October 1999 to mid-January 2000 without incident.

Dale left Terre Haute on another writ on January 19, 2000, and returned three months later on April 19. He was placed in the SHU when he returned and went through the usual intake screening to determine if there were "special issues or needs which require[d] housing or services other than [those] offered in the general population." Defendant Lynn Fortune conducted the screening, at which time Dale first reported his past troubles with the Muslim community in general and one inmate in particular. Dale told Fortune he was assisting law enforcement officials and had testified in court, and he thought this was the source of the trouble. However, Dale didn't mention anyone by name—he identified Sean Lewis only several years later—and he did not give any details. Dale

just said he was having "problems." He also told Fortune that he wanted a transfer from Terre Haute because he "could not live in general population." Dale wanted to move to the federal prison in Pekin, Illinois, a step down on the security scale—Terre Haute being maximum security, Pekin being medium security. But Fortune, as an intake screening officer, lacked the authority to transfer prisoners, so he stayed in the SHU pending further review.[1] Fortune had no contact with Dale after this initial interview.

Defendant Pamela Poston then met with Dale in the SHU on April 25. Poston was Dale's case manager at the time, but she, too, lacked transfer power. In fact, she did not even have the authority to *initiate* a transfer request; that was the sole province of the unit manager, at that time a man named James Cross. Before she met with Dale, Poston was aware that he might be facing some problems. Poston was copied to an e-mail on April 18 from Robert Glancy, regional designator at the Mid-Atlantic Regional Office, stating as much. Glancy reported that a federal

---

[1] The intake review process is complex; the transfer process more so. The intake review is a team effort, but only one member of the team (the unit manager) has the authority to recommend a transfer. If the unit manager feels a transfer is warranted, she forwards the request to the warden. The warden also lacks the power to transfer an inmate unilaterally; he has the discretion to reject a transfer, but he must forward a request he favors to the appropriate BOP regional office. Only that office—with oversight of multiple prisons—has the power to transfer someone.

prosecutor had called him and said he was under the impression Dale had been threatened in some way and other inmates might know he was cooperating. In light of this call, Glancy instructed Poston and the review team to "ensure a thorough intake interview is conducted to determine if there are any security concerns" and, "if appropriate, prepare a referral for redesignation."

As was his habit, Dale was vague with Poston, saying that "they" were "pressuring" him and "asking questions," without explaining who "they" were or what exactly they said. Despite Poston's request for more information, Dale kept quiet and just reiterated his desire for a transfer to Pekin. Poston told Dale that the regional office was responsible for his security designation and that a transfer would have to be approved by personnel in that office. In the meantime, Poston informed Dale that "if he was in fear [for] his personal safety, or in danger of an assault or attack, . . . we could [keep] him in the SHU and begin a protective custody investigation." Dale declined. Whenever Poston made this suggestion, Dale always responded with remarks like "it's OK" and "I don't want to go out like that." Poston was sympathetic to Dale's hopes for a transfer, so she told him a move was possible if Dale could "verify that he could not live safely in the general population" at Terre Haute. Again, Dale failed to extrapolate on his fears, so no transfer request was initiated. Indeed, Dale did not even tell Poston that he had been labeled a snitch. And it is undisputed that, absent a verifiable threat, Dale's "custody classification score" required him to be at a maximum-security facility like Terre Haute.

Dale was equally guarded in his discussions with defendant Eric White. White was Dale's correctional counselor, and the two met on April 26, 2000, as part of the next phase in the team-review process. Dale told White that the "pressure was on," that "they were asking questions," and that he wanted a transfer to Pekin. White's response was consistent with Poston's—he told Dale that a transfer could only be approved by the regional office, based on either a change in Dale's security designation or a protective custody investigation that revealed a true safety issue. White insisted that the regional office and the warden would need more specific information about who was threatening him and why, but Dale always answered with "you know who" and "I am not going to say anymore." When White suggested protective custody in Terre Haute (i.e., staying in the SHU permanently), Dale said he did not "want to lock up because they will know why I am doing it." In other words, Dale thought holing up in the SHU would be a sure sign to other inmates that he was a snitch.

Although Dale didn't want to stay in the SHU, he remained there for three weeks due to the nature of the process—the reentry evaluation is involved and a bed has to be located in general population. But even then Dale was not placed in general population, as he left on another writ on May 10.

While Dale was out, the same AUSA who had called Glancy wrote a letter to the warden on May 17, informing the warden that Dale might be under threat from other inmates. A different AUSA said the same thing months later on September 11, just days before the attack. The

warden, who is no longer a defendant in this case, evidently took no action on these letters. If he did do something, he never told the defendants about it or even the fact that he had received these letters.

Dale returned to Terre Haute three months later, on August 9, 2000. Per normal procedure, he was placed in the SHU for intake screening, where defendant Phyllis King conducted the interview. Dale told King he had been to court six times since May 1998 and inmates were "asking questions." He therefore asked King for a transfer to a different facility. Again, though, Dale didn't name any names, he didn't say that his life was in danger, and he ended by saying he would go into Terre Haute's general population "if you make me." As an intake officer, King lacked authority to transfer a prisoner; in line with standard policy, she designated Dale for housing in the SHU pending a team review of his return circumstances.

On August 11, Poston met with Dale a second time. Dale renewed his request for a transfer but again stonewalled Poston's demand for more information. Apparently, Dale thought his allegations of "pressure" and "questions" were enough. They were not. Dale was released into general population on August 15, 2000, when the housing committee determined that there was no reason for him to remain in lock up.

Shortly after he returned to Unit E, Dale approached inmates Omar and Wahdu, two "Muslim elders." Hoping to absolve himself of the snitch label and win favor with the Muslims, Dale told them he came back to general population because "nobody went to trial." In truth, Dale

had testified against Lewis, and Omar and Wahdu were "suspicious" because this was Dale's fifth or sixth time returning from a writ. Dale was not satisfied they bought his story, either. From August 15 to September 22, Dale visited Poston and White in their offices several times, each time reminding them that he wanted a transfer out of Terre Haute. Just like before, however, Dale never "express[ed] any specific threat that would make it dangerous or impossible for him to continue to live in general population." Nor did he identify any particular inmate or group of inmates that was giving him problems. Once more, Dale refused Poston and White's offers of detention in the SHU.

Shawn Sykes, not named as a defendant in this action, was Dale's unit manager for most of this saga. He was the one with the authority to initiate a transfer request, and he also supervised the other members of the unit team, including King, White, and Poston. (Sykes was not in charge of Fortune when she interviewed Dale because he did not become unit manager until July 2000.) Skyes saw no reason to transfer Dale to Pekin because (1) there was no verifiable information that Dale faced a threat; and (2) Dale's circumstances warranted incarceration at a high-security prison. However, Sykes did not know about the e-mail from Glancy or the two letters sent by AUSAs to the warden. Had Sykes known of these materials, he might have recommended a transfer.

In the meantime, while Dale privately feared retaliation from Lewis, trouble arose with a different inmate, Parish Barnes. Barnes, also a member of the Muslim group, was the man with whom Dale should have been concerned—he

was the one who would ultimately make an attempt on Dale's life. Barnes was telling other inmates that Dale "done been to court several times and . . . shouldn't be allowed to stay." Then Barnes began to loiter outside Dale's cell and give him menacing looks, prompting Dale to seek assurances from elder Omar that Barnes wouldn't be a problem. Omar assured Dale that Barnes would not harm him. Whether a lie or an innocent misapprehension of his own ability to control Barnes, Omar's assessment proved false.

Things came to a head on September 22. Barnes approached Dale in the yard as he was working out and talking to another inmate, a man named Pieto. Barnes told Pieto that he "shouldn't be talking to that hot MF,"[2] and "if it was up to me he wouldn't be here." Pieto grabbed Barnes by the arm and told him to let it go. Barnes cooperated, but he warned Dale that he would "see [him] in the unit." Dale responded in kind, and Barnes walked away with Pieto. Though the situation appeared to be defused, it was not. Barnes came back a few moments later and said, "let me talk to you." As they walked along, Barnes stabbed Dale seven times with a knife.[3]

Judges, of course, must construe *pro se* pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). But procedural rules cannot be ignored. Here, after Dale prevailed on a jury trial on the issue of exhaustion, the parties conducted discovery and the defendants filed a motion

---

[2] "Hot" in this context refers to a "snitch."

[3] Apparently, Mr. Dale has made a full recovery.

for summary judgment. Dale filed a brief in opposition, but the district court ignored it because it failed to comply with a local rule. Designed to facilitate summary judgment, the rule mandates that a party opposing a motion must "include a section labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts" and shows that issues of fact remain for the jury. S.D. Ind. Local Rule 56.1(b). "These facts shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence . . . ." *Id.* The district court found that Dale had contravened the rule because, although he had included a sworn statement along with his opposition brief, it was "argumentative" and "lack[ed] detail." *Dale v. Poston*, 2006 WL 1328724, *2 (May 11, 2006). As a result, the court ignored Dale's submission and adopted the defendants' statement of facts. This would normally give us pause to inquire whether Dale was given a fair shake, but his attorney tells us "[i]t is counsel's considered judgment that, even if the district court erred in disregarding Dale's submission, any such error was harmless and does not require reversal." Upon this record, the district court held that no reasonable jury could conclude that the defendants acted with deliberate indifference.

We review a decision granting summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *Walker v. Sheahan*, 526 F.3d 973, 976 (7th Cir. 2008). Summary judgment is proper if "there is no genuine issue as to any material fact," such that "the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). The ultimate question is whether "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Dale's claim rests on the Eighth Amendment. "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). Yet, a prison official does not violate the Eighth Amendment every time an inmate gets attacked by another inmate. Prisons, after all, are dangerous places often full of people who have demonstrated aggression. And so, an inmate has no claim "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The deliberate indifference test therefore has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Once prison officials know about a serious risk of harm, they have an obligation "to take reasonable measures to abate it." *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Of course, an official's response may be reasonable even if it fails to avert the harm. *Id.*

Another way to think of it: picture an inmate with a cobra in his cell. If the prison officials "know that there

is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference." *Billman v. Ind. Dep't of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995). The precise identity of the threat, be it a cobra or a fellow inmate, is irrelevant. A prison official "cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Mayoral v. Sheahan*, 245 F.3d at 939. On the other hand, as the vagueness of a threat increases, the likelihood of "actual knowledge of impending harm" decreases. *See Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). So, too, does the official's ability to respond. The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances.

We agree with the district court that the defendants in this case are entitled to summary judgment. As it turned out, there *was* a cobra lurking in the grass; the objective prong is satisfied. But that's not dispositive. The focus is on the defendants' subjective state of mind, and for all they knew, Dale was being harassed by a garter snake. Irritating, yes. Deadly, no. Dale's vague statements that inmates were "pressuring" him and "asking questions" were simply inadequate to alert the officers to the fact that there was a true threat at play. *See Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (holding that an inmate who "told jail officials only that he was afraid and that he wanted to be moved" failed to put those officials on notice of an actionable threat). There is no evidence that any of the defendants here were aware

of facts from which they could draw an inference of substantial harm, let alone evidence that they actually drew that inference.

Dale asks us to find deliberate indifference due to the inherent risks faced by snitches in prison; he would have Eighth Amendment liability every time an inmate known to be cooperating with authorities is attacked. That would be quite a stretch. Just because a correctional officer knows an inmate has been branded a snitch—and it's common knowledge that snitches face unique risks in prison—does not mean that an officer violates the Constitution if the inmate gets attacked. *Cf. id.* at 775-76 (suggesting that officer knowledge of a snitch reputation may *support*, not prove, a claim for deliberate indifference). Each case must be examined individually, with particular focus on what the officer knew and how he responded. Poston, Fortune, King, and White all listened when Dale expressed fear for his safety; they all implored him for details; and they all offered to start a protective custody investigation with detention in the SHU in the meantime. Dale had multiple opportunities to take them up on their offer, but he declined.

Dale argues that he refused protective custody because it would have been a sure signal that he was cooperating with authorities. Probably so. *See* James E. Robertson, *A Clean Heart and An Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, 459 (2003) (prisoners "assume [inmates in protective custody] are snitches"); *David K. v. Lane*, 839 F.2d 1265, 1267 (7th Cir. 1988) ("An inmate may request a transfer

to protective custody but is usually somewhat reluctant to do so because of the stigma attached to such a request."). Yet, it's undisputed that Dale could have remained in protective custody if he wanted. With limited social opportunities, that may not have been the most pleasant of experiences, but it would have eliminated the risk of an attack. Prison officials do not violate the Eight Amendment because the mode of protection they offer does not sit well with a prisoner. Rather, if they offer reasonable protection from the threat, they have done their duty.

But Dale says the defendants did not respond reasonably because a reasonable response would have been a transfer. In making this argument, Dale places a lot of weight on the testimony of Sykes, the unit manager at the time of the attack. Sykes testified that, had he known about the prosecutors' concerns, he may have drafted a transfer request for the warden's signature. But just because one official would have responded differently—in this case by advocating for a transfer—does not mean the other officials responded unreasonably. It was quite natural to assume that, had Dale's situation in general population been so dire as to warrant a transfer, he would have taken advantage of protective custody. At the very least, he should have spoken up when Poston and the others pressed him for specifics. Moreover, Dale wasn't looking for just any transfer—for him, it was only Pekin. Pekin has a lower security rating than Terre Haute, so that was another reason for the defendants to hesitate when Dale requested a transfer. And for all that, they did not dismiss Dale's request out of hand—they

asked him for supporting details. *See Grieveson*, 538 F.3d at 777 (affirming summary judgment in favor of prison officials who did *not* make such an effort). We cannot emphasize enough the prisoner's responsibility to furnish information in these situations, a responsibility that Dale shirked.

The fact that federal prosecutors and the regional BOP director were concerned for Dale's safety changes nothing. Acting on a prosecutor's advice, the regional director instructed Terre Haute personnel to perform a thorough intake screening to evaluate potential risks to Dale. Poston and the others followed these instructions, giving Dale the option of protective custody and begging him for details so they could determine whether a transfer was appropriate. That is not deliberate indifference; it is almost the opposite. What more should they have done? Segregate Dale against his will? We will not create this sort of constitutional Catch 22—where prison officials violate the Eight Amendment if they don't segregate a prisoner but violate the Due Process Clause if they do. *See Hewitt v. Helms*, 459 U.S. 460, 472 (1983) (holding that moving a prisoner from general population to administrative segregation is a deprivation of liberty that must be accompanied by due process of law).

Dale cites scholarly materials to show that informants occupy the lowest rung in the prison hierarchy. *See, e.g.*, Robertson at 461 ("The inmate code condemns snitching. Indeed, as an act of betrayal, it merits assault, sodomy, and even murder."). We do not doubt that. Nor do we doubt that protective custody is often necessary to

ensure the safety of these inmates. However, that only proves the reasonableness of the defendants' actions—*they offered to place Dale in protective custody*. It's a shame he refused, but the defendants really can't be blamed. And even if they can, they were negligent at most. The Eighth Amendment requires more than that. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

The judgment of the district court is AFFIRMED.