In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-3630

TIBERIUS MAYS,

*Plaintiff-Appellant,*

*v.*

JEROME SPRINGBORN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-1254—**Harold A. Baker**, *Judge.*

SUBMITTED JUNE 23, 2009*—DECIDED JULY 16, 2009

Before CUDAHY, POSNER, and EVANS, *Circuit Judges.*

PER CURIAM. Tiberius Mays, an Illinois inmate, appeals
from the grant of summary judgment on his claims
about prison food and clothing, and from the grant of

---

* After examining the briefs and the record, we have con-
cluded that oral argument is unnecessary. Thus, the appeal
is submitted on the briefs and the record. See FED. R. APP.
P. 34(a)(2).

judgment as a matter of law on his claims about retaliation, strip searches, and the censorship of pages from a magazine. We affirm the challenged rulings regarding food, clothing, and the magazine, but we vacate and remand the rulings on the strip search and retaliation claims.

## Background

In 1998 and 1999, Mays was housed at Stateville Correctional Center. He and other prisoner-employees were strip searched daily going to and from their prison jobs. Mays testified at trial that the searches were performed in view of other prisoners, that they were sometimes accompanied by demeaning comments from guards, that they were sometimes done in a cold room, and that the guards did not change their latex gloves as they searched one inmate after another. He filed a grievance about the searches and was told that public searches were not allowed except in emergency situations. A memo from the prison's chief of security was distributed to prison guards reminding them of this rule, but according to Mays, the searches continued to be performed publicly. At trial, Mays's description of the public searches was corroborated by two fellow inmates but substantially contradicted by the prison guards who performed them. According to the guards, the searches were always performed out of view of other inmates and were necessary to ensure safety because prisoners had access to tools at their jobs that could be dangerous if successfully smuggled out of the work area.

Before one of the routine searches at Stateville, Mays showed one guard the memo from the prison's chief of security reaffirming the prison's rule against public searches. After leaving the area briefly, Mays returned and retrieved the memo before being directed to a different guard to be searched. Mays testified that he saw the guard to whom he showed the memo nod at the guard who was to search him. The searching guard began the search and said that he saw something in Mays's anus. That guard called over the first guard and another guard to have them look as well, and those guards—one of them smirking, according to Mays—also said that they saw something. As a result, Mays was subjected to a five-and-one-half hour ordeal in a strip cell. He was handcuffed behind his back and made to wear a too-short hospital gown while the guards waited for him to defecate. Guards had never found anything hidden on Mays's person before and they ultimately found nothing hidden on him during this episode. At trial, the first guard said he did not recall Mays showing him the memo and the second guard said he did not recall a nod or anything else that preceded the search. Both guards testified that they did in fact see something in Mays's anus.

Mays was transferred to Hill Correctional Center in 2000 and strip searched upon his arrival. Mays says that this search was also done in front of other inmates, though the guards who performed the search disagreed.

While at Hill, Mays raised two concerns about the food he was given. As a follower of the African Hebrew

Israelites, Mays received a vegan diet, but the prison refused to provide him with certain dietary supplements he says his religion considers to be religious necessities: blackstrap molasses, sesame seeds, kelp, brewer's yeast, parsley, fenugreek, wheat germ, and soybeans. In addition, Mays believed that the food he was given lacked adequate nutrition. He filed grievances about both issues and was told that the supplements could not be provided because each one either posed a security threat or was not part of the prison's procurement program. In response to his other grievance, an administrator agreed that the vegan menu at Hill was deficient and promised to change it.

Mays also complained about the clothing Hill gave him. He stated that he was not issued winter underwear, boots, galoshes, a sweater, gloves, scarves, or wool socks and, as a result, he suffered from hurt ears, numb hands, and felt frostbite in his fingers and toes.

Finally, Mays complained about an instance of censorship in which prison officials at Hill removed pages from an issue of Vibe Magazine mailed to him. Prison officials testified that the prison's publication review board was concerned about an article in the magazine that described a violent prison riot. The board sent the magazine to the review board in Springfield, which ordered the removal of the six-page article as well as three other pages containing pictures of people they believed were making gang signs.

The district court disposed of Mays's diet and clothing claims at summary judgment. First, the court ruled that Mays had failed to present evidence to rebut the valid

penological purpose behind the denial of the dietary supplements. As for the claim of inadequate nutrition, the court found Mays's evidence insufficient to show that he had been harmed or that the defendants disregarded his complaints. The court granted summary judgment on the clothing claim too, reasoning that the undisputed evidence showed Mays had been provided with sufficient clothes (a winter coat, boots, and a winter hat), that Mays was not claiming exposure to cold weather for extended periods of time, and that Mays could not show that the defendants were deliberately indifferent to his need for winter clothing.

Mays was allowed to proceed to trial on the remaining claims, but they never reached a jury because the district court granted judgment as a matter of law for the defendants on each one. The first claim that the district court resolved concerned the removal of pages from Mays's magazine. The court interrupted Mays's presentation of his case and directed the defendants to present witnesses on this issue without the jury present. The court gave Mays the opportunity to present his own evidence on this claim, but Mays submitted only his written grievance about the censorship. The court then asked the defendants' lawyer, "Do you understand Federal Rule of Civil Procedure 50?" Counsel took the court's cue and moved for judgment as a matter of law on Mays's censorship claim. The court granted the motion because it concluded that the defendants had presented a legitimate penological reason for censoring the pages, had removed no more pages than necessary,

and that Mays had failed to present any evidence to show that the censorship was an exaggerated response.

The trial continued on the remaining claims, but after Mays rested, the defendants made another motion for judgment as a matter of law. The court granted the motion on the claim about the searches at Stateville, reasoning that Mays had failed to present "any credible evidence that the searches were unrelated to prison needs and meant only to inflict psychological pain." The court discounted the significance of the factual dispute over the public nature of the searches, apparently reasoning that group searches are constitutional as a matter of law. The court did not mention the search at Hill in either its oral or written ruling. Finally, the court granted judgment as a matter of law to the defendants on the retaliation claim, ruling that Mays's evidence consisted of only his own "unsupported conclusion that he felt he was being retaliated against."

## Analysis

### A. Dietary Supplements

First, Mays argues that the district court's summary judgment ruling on the dietary supplements must be reversed because he presented enough evidence from which a jury could find the prison's policy to be invalid. According to Mays, the prison failed to support its explanation that all of the supplements either posed security threats or were not part of the prison's procurement program. He points to his own evidence showing

that the supplements were available at other prisons, and thus urges that this claim should have gone to trial. He also argues that the district court erred by failing to explicitly consider all four factors outlined in *Turner v. Safley*, 482 U.S. 78 (1987), for determining whether a prison regulation is backed by a valid penological purpose.

The district court properly granted summary judgment on Mays's claim regarding the supplements. When a prison impedes an inmate's religious exercise—the district court assumed that the denial of the supplements did—it must present a legitimate penological reason for doing so. *See Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005). But Mays is wrong to assert that the prison bears the burden of proving that its penological reason is legitimate. Once the prison gave its explanation for denying the supplements, the burden shifted to Mays to present evidence to call that explanation into question. *See Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). Mays might have tried to prove that the supplements posed no security risk or that they were easily obtainable, but the only evidence he produced was that the supplements were allowed at other prisons. Evidence of the rules in other prisons is not, by itself, sufficient to call into question the prison's explanation. *See Fowler v. Crawford,* 534 F.3d 931, 942 (8th Cir. 2008); *Spratt v. Rhode Island Dep't of Corr.*, 482 F.3d 33, 42 (1st Cir. 2007).

Mays's argument that the district court did not properly apply *Turner* also fails. *Turner* describes four factors that are "relevant" to determining whether a

prison regulation has a valid penological purpose. *Turner*, 482 U.S. at 89-91. We have said that the district court "must" consider those factors, *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004), but it need not explicitly articulate its consideration of each one, *see Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80-81 (5th Cir. 1992); *but see Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir. 2004). Where, as here, there is only minimal evidence suggesting that the prison's regulation is irrational, running through each factor at length is unnecessary.

**B.  Adequacy of Diet**

Mays next argues that the district court should not have granted summary judgment on his claim about the adequacy of his diet because it misunderstood the supporting evidence. The court thought Mays had submitted no evidence of harm, but he points to medical records that show he had a low white blood cell count and to his own statements that he felt fatigue. Mays also criticizes the court's failure to account for a prison official's statement that his diet was "inadequate," and he notes that the court repeatedly referred to that official by the wrong name.

We agree with Mays that the district court's ruling on this issue is less than perfect, but we affirm because Mays failed to show that prison officials were deliberately indifferent to a risk posed by his diet. Under the Eighth Amendment, a prisoner's diet must provide adequate nutrition, *see Antonelli v. Sheahan*, 81 F.3d 1422,

1432 (7th Cir. 1996), but prison officials cannot be held liable under the Eighth Amendment unless the prisoner shows both an objectively serious risk of harm and that the officials knew about it and could have prevented it but did not. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Mays's evidence did show *some* harm: it does not take a doctor to diagnose fatigue and Mays did in fact submit medical records confirming his low white blood cell count. We doubt that fatigue and a slightly lower-than-normal white blood cell count is enough to show an objectively serious harm, but even if Mays's evidence could satisfy the first prong, it cannot satisfy the second prong—that the defendants knew of and ignored the risk. On the contrary, the undisputed evidence shows that prison officials acknowledged that Mays's diet was inadequate and took steps to fix it. Their reasonable response to the problem precludes a successful showing of deliberate indifference. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008).

## C. Winter Clothing

Mays also contends that he produced enough evidence for a trial on his claim that Hill provided him with clothing inadequate to protect against cold winter weather. That evidence included his statements that because he was never issued certain clothing items, he suffered from hurt ears and numb hands, felt frostbite, and caught colds. But this evidence does not rise to the level of the objectively serious harm necessary to show an Eighth Amend-

ment violation. *See Townsend*, 522 F.3d at 773. Mays did not show that he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter. *Cf. Gillis v. Litscher*, 468 F.3d 488, 490 (7th Cir. 2006) (prisoner forced to sleep naked in cold cell had to walk around 14 hours a day to keep warm); *Dixon v. Godinez*, 114 F.3d 640, 642-44 (7th Cir. 1997) (prisoner with inadequate clothing or bedding could not keep warm in cell with average temperature of forty degrees).

### D.  Magazine Pages

Next, Mays argues that the district court should not have granted judgment as a matter of law on his censorship claim because a jury could have found that the prison's reasons for censoring the pages were not reasonable. He notes that other sources—books and television shows—describing prison riots were available to him. He also contends that the district court showed a disposition against him when it interrupted his presentation of evidence, and that the court altered the burden of proof when it directed the defendants to present their evidence outside the presence of the jury.

Mays fails to show that the district court erred. Prisons have great latitude in limiting the reading material of prisoners, s*ee Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), and it takes no great leap to understand the prison's reasons for wanting an article about a prison riot and images of gang signs kept away from inmates. *See id.* at 417 (rational to exclude materials that "create an intolera-

ble risk of disorder"); *see also Harbin-Bey v. Rutter,* 420 F.3d 571, 578-79 (6th Cir. 2005) (approving censorship of works depicting gang signs). Mays's only argument that the prison's censorship was unreasonable is that he had access to other writings and to television shows about prison riots, but the deference we afford prisons permits such seeming inconsistencies. *Thornburgh*, 490 U.S. at 417 n.15.

Nor do we see error in the manner in which the district court handled this claim. A district court has the power to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." FED. R. EVID. 611(a); *see also Johnson v. Doughty*, 433 F.3d 1001, 1009 (7th Cir. 2006). And changing the order in which evidence is presented does not change the burden of proof. The court gave Mays the chance to present evidence about the claim and considered his arguments before ruling. The court may have doubted the strength of the claim, but it did not show an improper bias against Mays.

### E. Strip Searches

Regarding the Stateville strip search claim, Mays argues that he presented enough evidence to reach the jury. That evidence was that Mays was subjected to daily strip searches in view of other inmates, that the searches were sometimes done in a cold room, that guards did not regularly change their latex gloves, that guards sometimes made demeaning comments as they

searched the naked prisoners, and that the searches were done in knowing violation of the prison's regulations.

Mays is correct that the district court should have let this claim go to the jury. The district court seemed to rely heavily on the valid penological reason justifying the searches, but still, the manner in which the searches were conducted must itself pass constitutional muster. *See Bell v. Wolfish*, 441 U.S. 520, 560 (1979); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Del Raine v. Williford*, 32 F.3d 1024, 1040 (7th Cir. 1994). To win his claim, Mays had to show that the searches were conducted in a harassing manner intended to humiliate and cause psychological pain. *See Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004); *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004); *Calhoun*, 319 F.3d at 939. Group searches are not, as the district court seemed to conclude, per se constitutional*. See Farmer v. Perrill*, 288 F.3d 1254, 1261 (10th Cir. 2002). If the jury found that they were performed without a valid reason—and the guards provided no justification for group searches because they denied performing them—it could have found for Mays. *Id.* It could have also found that the searches were intended to harass based on testimony about the guards' demeaning comments, their dirty gloves, and the temperature of the room where the searches were done. Finally, although violation of the prison's rule against public searches was not, by itself, a violation of the constitution, *Whitman*, 368 F.3d at 935 n.1, it was relevant evidence on which the jury could have relied to conclude that the searches were done with an intent to harass.

Next, Mays argues that the district court failed to consider his claim regarding the strip search at Hill. He is correct. We remand this claim so that the court can consider it in the first instance.

## F. Retaliation

Mays's argument about his retaliation claim is again that he presented enough evidence to reach the jury. He argues that he presented substantially more than—as the district court put it—an "unsupported conclusion that he felt he was being retaliated against." Mays testified that in retaliation for his complaint about routine searches, guards subjected him to a non-routine search that was very humiliating.

Mays's retaliation claim raises another factual question that should have gone to the jury. To establish a prima facie case of retaliation, a prisoner must show that a protected activity—appellees concede that his complaint about the searches qualifies—was "at least a motivating factor" in retaliatory action taken against him, i.e., action that would likely deter protected activity in the future. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The burden then shifts to the defendants to show that they would have taken the action despite the bad motive. *See Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005-06 (7th Cir. 2005). Mays presented a chronology of events from which retaliation could be inferred: almost immediately after making his protected complaint about strip searches, the guards subjected him to a much more onerous search. *See Marshall v. Knight*, 445 F.3d 965, 970-71 (7th Cir. 2006). By testifying that they truly saw something in

Mays's anus, though, the guards offered a non-retaliatory motive for the onerous search. Even if the guards were partly motivated by Mays's complaint about the routine searches, they would not be liable for retaliation if a jury believed that they would have performed the extended search no matter what. *See Hasan*, 400 F.3d at 1006. But the jury was also entitled to disbelieve the guards because Mays did more than just suggest that they were not telling the truth; his own testimony told a plausible enough story for why they would have lied. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 582-83 (7th Cir. 2004). Judgment as a matter of law cannot be granted on an issue that turns on witness credibility. *See Burger v. Int'l Union of Elevator Constructors Local No. 2*, 498 F.3d 750, 753 (7th Cir. 2007).

## G. Recruitment of Counsel

Finally, Mays challenges the district court's repeated refusal to recruit counsel for him. When an indigent plaintiff seeks pro bono counsel, the district court must consider both the difficulty of the case and the plaintiff's competence to litigate it without counsel. *See Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). Mays contends that the district court never considered his competence, but he is mistaken. In its second of five orders ruling on Mays's requests for counsel, the district court did consider Mays's competence before denying the request. Although the court's other rulings addressed only the case's difficulty without mentioning Mays's competence, we assume that those rulings embodied the same

analysis of Mays's competence that was reflected in the second order. In any event, Mays has not established that the lack of counsel prejudiced him. *See Pruitt*, 503 F.3d at 659. If he renews his request for counsel on remand, the district court should either take a fresh look at both prongs of the analysis or explicitly state that it is relying on the earlier ruling that considered both prongs.

## H.  Other Issues

Mays has challenged various other aspects of the district court's rulings. We have considered his arguments and reject them without further comment.

## Conclusion

Accordingly, we AFFIRM the district court's summary judgment rulings, we AFFIRM the court's grant of judgment as a matter of law on the censorship claim, and we VACATE the court's grant of judgment as a matter of law on the strip search and retaliation claims. We REMAND for proceedings consistent with this order.