NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 11, 2011[*]
Decided May 24, 2011

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

JOHN L. COFFEY, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

No. 10-3744

| | |
|---|---|
| ROGER YEADON, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of Indiana, |
| | Terre Haute Division. |
| *v.* | |
| | No. 2:07-cv-70-JMS-TAB |
| HARLEY G. LAPPIN, et al., | |
| *Defendants-Appellees*. | Jane Magnus-Stinson, |
| | *Judge*. |

**O R D E R**

     Roger Yeadon, a federal prisoner, appeals the grant of summary judgment against him under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He maintains that prison officials failed to protect him adequately from fellow inmates, who he says targeted him because he cooperated with the government. Because the appellant failed to show that the officials violated his constitutional rights, we affirm.

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

For our review, we construe the record evidence in Yeadon's favor. *See Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). In 1996 the plaintiff-appellant, then an Alabama prisoner, escaped and fled to New Mexico with a fellow escapee, Michael Thompson. While fugitives, they stole a car and killed its driver, a British army major attending a conference in New Mexico. Once caught, Yeadon cooperated with federal authorities in Thompson's prosecution. A federal court sentenced the appellant in 1999 to more than 18 years in prison for the car jacking and resulting death, *see* 18 U.S.C. § 2119(3), and an Alabama court sentenced him to life. At the plaintiff-appellant's request, the federal judge ordered that he serve his federal prison term in a federal facility. When that term ends he will be transferred to the Alabama authorities.

According to Yeadon, many prisoners in the federal prison system know that he cooperated with the government in Thompson's prosecution. The Discovery Channel turned his story—including his escape and assistance to the government—into an episode of its show *FBI Files* and reruns the episode every few months on the cable network broadcast to federal inmates. Also, Thompson joined a white-supremacy group, and, the plaintiff insists, the group has offered a reward to any prisoner who hurts or kills him.

Yeadon has faced periodic hostility from fellow inmates. During pretrial detention in 1996, he suffered two assaults—he assumes because of his cooperation with the government—prompting officials to move him to a smaller prison. He then went nearly seven years without any threats, until 2003—about a year and a half after his story first aired—when word spread about the show, and inmates began calling him a "rat" and a "snitch." While in special housing, he fought off an assault by his cellmate, a member of a white-supremacy group, but he never reported the incident as he wanted to keep a low profile. After a transfer to Victorville, California, he requested special housing when white supremacists, citing the *FBI Files* episode and the price on his head, threatened him. In response, the staff at Victorville sent him to Terre Haute, Indiana. During intake at Terre Haute, an inmate from Victorville recognized Yeadon, spread word that he was a "snitch," and convinced other inmates to gang up on him. The appellant promptly asked for and received protective custody. Once there, he says, two inmates aware of his story threatened him during recreation time, but did not attack him.

In the meantime, Yeadon had also been asking to move to an Alabama state facility, where, he insists, there is neither cable television nor any inmates who know Thompson. (And where, according to the Discovery broadcast, he has escaped from custody four times.) First he urged his federal sentencing judge to reverse her order directing that he stay in federal custody, and she refused. The plaintiff-appellant then asked the prison officials overseeing the Victorville and Terre Haute facilities to transfer him to Alabama, and they also refused.

Because of the threats the appellant received, the Terre Haute staff decided to move him to Beaumont, Texas. His attorney opposed the move, writing to Terre Haute Warden Veach (and other officials) that the federal prison in Beaumont was notoriously dangerous, filled with gang members, and near where the plaintiff's crime occurred. The day after Yeadon arrived at Beaumont, inmates assaulted and severely bruised him. (The assailants were not known gang members, but the plaintiff-appellant assumes they had ties to white supremacists.) Beaumont guards immediately placed him in special housing, and a month later he was relocated to Lewisburg, Pennsylvania. The Lewisburg prison has many white-supremacy groups, the appellant says, so he again requested protective custody. The prison staff agreed that the plaintiff was in danger and moved him to a federal prison in Florida, where he has remained without incident since 2008.

Not satisfied, Yeadon turned to federal court. As relevant here, he sued the Director of the Bureau of Prisons, the wardens and directors overseeing his incarceration at Victorville and Terre Haute prisons, and the chief of the division that designates prison assignments, all in their official and individual capacities. He argued that they deliberately ignored the risk that inmates would attack him, subjected him to unconstitutional conditions, and retaliated against him for complaining to his sentencing judge and for filing this lawsuit. He insisted that the federal officials should have stopped airing his story in federal prison or remanded him to a state prison without cable television, preferably in Alabama.

The district court granted the prison officials' motion for summary judgment, reasoning that several of the defendants were not personally involved in the plaintiff's classifications and transfers, and those that were did not act with deliberate indifference. The officials' efforts to protect the plaintiff-appellant had generally been successful, the court observed, and when they were not, they were still reasonable.

Before turning to the merits, we address a preliminary matter. Yeadon asserts that *Bivens* enables him to sue defendants in their official capacities. He is mistaken; under *Bivens*, his suit can proceed against the officials in their individual capacities alone. *See Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011); *McCloskey v. Mueller*, 446 F.3d 262, 271-72 (1st Cir. 2006); *Glaus v. Anderson*, 408 F.3d 382, 389 (7th Cir. 2005).

On to the merits. The appellant concedes that he faces no immediate threat at his current location, calling it a "safe haven" and remarking that moving him there sooner would have satisfied his demands. But the officials, he argues, not only inadequately protected him earlier (given the supposed low-cost alternatives of sending him to Alabama

or stopping the Discovery Channel broadcasts), but also deprived him of a liberty interest protected by the Fifth Amendment and unlawfully retaliated against him.

We start with the deliberate-indifference claim. Officials are liable under the Eighth Amendment only if they were aware that a prisoner faced a substantial risk of harm and yet failed to take reasonable measures to address that risk. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009); *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Here, whenever the officials became aware of threats to Yeadon's safety, they acted reasonably by allowing him to enter special protective housing and transferring him to different facilities. Specifically, after the assault during pretrial detention in 1996, officials moved him and he remained safe for seven years; and after the attack in Beaumont, officials swiftly moved him again, and he has remained safe. The fact that officials could have taken a different approach does not make their chosen actions unreasonable. *See Dale*, 548 F.3d at 569-70; *Borello v. Allison*, 446 F.3d 742, 747-48 (7th Cir. 2006).

The plaintiff most vigorously attacks Warden Veach's decision to move him from Terre Haute to Beaumont. To have acted with deliberate indifference, however, Veach must have known that relocating Yeadon to Beaumont substantially threatened his safety. *See Dale*, 548 F.3d at 569; *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). We can assume that Veach knew about the risk posed by the television show and the violence at Beaumont. But the plaintiff-appellant furnishes no evidence that Veach had reason to foresee that assailants without known gang membership or knowledge of the broadcast would spontaneously attack Yeadon at Beaumont. Beaumont's reputation for violence did not presage that the appellant would be its next victim; prisons generally "are inherently dangerous places and are inhabited by violent people." *United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2002); *see Grieveson*, 538 F.3d at 777. Moreover, before the move to Beaumont (and since then), prison officials successfully shielded the plaintiff when inmates specifically targeted him. Thus Veach did not deliberately ignore a substantial threat to Yeadon's safety.

The plaintiff-appellant next contends that the transfers violated the Fifth Amendment because his confinements were harsh. To survive summary judgment on the Fifth Amendment claim, he had to show that the conditions of his confinement were atypically harsh. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009). But prison transfers alone are insufficient to meet that standard. *See Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005). And the plaintiff presented no evidence that the conditions in special housing were unusually harsh, either; in fact, his three requests to *return* to special housing undermine that claim. *See Sandin*, 515 U.S. at 486 n.9.

This brings us to Yeadon's two retaliation claims. First, the plaintiff-appellant contends that his letter to his sentencing judge led to retaliation. But he offers no evidence that the letter caused any injury, so the claim does not get off the ground. The appellant also argues that officials retaliated against him for filing suit by pushing back his release date by two years. But the plaintiff must raise any dispute he has with his release date through a petition for habeas corpus. *See Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005); *Glaus*, 408 F.3d at 386. Moreover, this point appears moot: Yeadon tells us in his reply brief that the Bureau has already corrected his release date.

The appellant last contends that the district court should have delayed summary judgment, as he urged, because he insists that his outstanding discovery requests would have shown that the officials acted with deliberate indifference. We review decisions on discovery matters for abuse of discretion, and the plaintiff-appellant must show that the court's decision caused him actual and substantial prejudice. *See Walker v. Mueller Indus., Inc.*, 408 F.3d 328, 334 (7th Cir. 2005); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319 (7th Cir. 2003). The plaintiff cannot meet that burden here. As the district court noted, Yeadon failed to specify anything new that he expected the discovery to reveal about the officials' knowledge.

AFFIRMED.